690 A.2d 156

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHRISTOPHER D. COLELLA, DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 23, 1997—Decided March 20, 1997.

Before Judges KING and LOFTUS.

*Susan L. Reisner,* Public Defender, attorney for appellant (*William Welaj,* Designated Counsel, on the brief).

*Peter Verniero,* Attorney General, attorney for respondent (*Arthur S. Safir,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

LOFTUS, J.A.D.

This case involves the extended term provisions of *N.J.S.A.* 2C:44–3e which were adopted in 1990 to provide enhanced punishment for crimes committed with a purpose to intimidate an individual because of race. *L.* 1990, *c.* 87, § 4. The trial judge sentenced Colella to an extended term under this section. The extended term sentencing procedure increased defendant's exposure from a minimum of five years and a maximum of ten years for a second-degree offense, *N.J.S.A.* 2C:43–6(a)(2), to a minimum of ten years and a maximum of twenty years, *N.J.S.A.* 2C:43–7(a)(3). We affirm.

Defendant Christopher D. Colella (Colella) appeals from a judgment of conviction of second degree aggravated assault, contrary to *N.J.S.A.* 2C:12–1b(1), after a jury trial. At sentencing, the judge granted the State's motion for imposition of an extended term under *N.J.S.A.* 2C:44–3e, and committed Colella to the custody of the Commissioner of the Department of Corrections for a term of sixteen years with a five and one-third year parole disqualifier. The judge also imposed a $50 V.C.C.B. penalty and ordered Colella to reimburse the victim for any unpaid medical bills upon release from prison.

On appeal, Colella contends that the judge inadequately charged the jury on the issue of causation; the jury's guilty verdict was against the weight of the evidence; and the judge erred in imposing an extended term under *N.J.S.A.* 2C:44–3e, thus resulting in a grossly excessive sentence. We conclude that these contentions are non-meritorious. We affirm.

This is a summary of the State's evidence. On January 14, 1993, at approximately 10:20 p.m., Lymus E. Young, a forty-three year old African–American janitorial worker of New Jersey Cleaning Services, was assigned to the Trenton Train Station. He discovered a MAC card which had been mistakenly left in the station's MAC machine. Because of the late hour, and because all station offices were closed, he decided to try to locate the owner of the card. With the card in his hand, he walked along and asked

various people if the card belonged to them. When he reached the station's main waiting area, Young first approached Willie McDaniel, who was waiting for the train to New York.

Young then walked over to two people who were seated about ten feet away. They were Colella, a caucasian, and his girlfriend, Lori Torres. According to Young, he did not touch Colella or Torres. He excused himself for interrupting and inquired as to whether the card belonged to Colella. Colella called Young names and told him to "get out of here." Young was surprised and said: "Gee, all I asked you is if this card belonged to you."

McDaniel, who observed the entire incident, testified that Colella appeared to be upset over an argument he was having with Torres. After Young inquired about the card, McDaniel reported that Colella said: "Nigger, get the fuck out of here, you see I'm talking to my woman." McDaniel confirmed that Young was surprised by Colella's response. Colella then jumped up and repeated: "Nigger, I told you to get the fuck out of here, you don't [sic] understand." As Young backed away, Colella punched him in the face. While holding his bloody face, Young continued to back up but was hit by defendant again in the face.

Almost simultaneously, Patrolman Robert Eisman arrived and arrested Colella. According to Eisman, as he approached the scene, he witnessed Colella come charging forward and hit Young once in the face. He observed that Colella was wearing a ring on his right hand and noted that Young was bleeding from under his left eye. Eisman also heard Colella call Young a "nigger," as well as say that "he would be beating blacks all his life." He summoned fellow officer Joseph Robbins for back-up and called an ambulance for Young who was bleeding and in pain. He then asked McDaniel and Torres what had happened.

McDaniel quickly informed Eisman that notwithstanding Colella's protestations of innocence and story of being "jumped" by Young, Young had done nothing to provoke Colella. At that point Colella interjected: "Oh, you're going to take the word of a nigger over me." This statement was heard not only by McDaniel, but

also by Young and officers Eisman and Robbins. According to McDaniel, as Colella was being handcuffed, he began to yell at Eisman: "Oh, you're nothing but a nigger lover, nothing but a nigger lover."

Young was taken by ambulance first to Helene Fuld Hospital and then to Wills Eye Hospital in Philadelphia where he was admitted and remained for three days. Even after his release he remained in constant pain, was unable to return to work and ultimately had to be readmitted to the Wills Eye Hospital. According to Young, although he had lost most of the vision in his left eye in 1973 after being scratched in the eye with a screwdriver, he had no pain in that eye until after being struck by Colella. He was advised that he would only get relief from the pain if the eye was removed. Young underwent the surgery approximately one month later and an artificial eye was implanted several months after that. Additionally, Young had some treatment to his mouth.

According to McDaniel, Colella became very agitated as he was escorted by the officers to the holding cell and broke a hinge on the door. Robbins also related that defendant became somewhat violent upon entering the Amtrak police holding cell, resisting the officers and shouting for Torres. According to Eisman, once defendant was in the cell he attempted to spit on Eisman.

Eisman summoned Amtrak Patrolman Odell Jones, an African–American, to the holding cell at approximately 10:35 p.m. for additional assistance because Colella was screaming and kicking. When Jones arrived at the holding cell area, he heard Colella state to Eisman that he could not believe the officer would take "a nigger's word" over his. According to Jones, Eisman did not respond but instead asked Jones for some advice on handling the situation. Jones recommended that they telephone Lieutenant Siebert and request that all officers be allowed to remain on duty until defendant was transported to the Trenton police station. Robbins testified that Colella overheard this conversation and stated: "You going to let a nigger order you around?"

Jones reported that Colella stated to him: "Nigger, I'll be out of jail—I'll be bailed out within half an hour, I'd like to meet you at—I will meet you over to [sic] the Four Seasons Restaurant over in Chambersburg and I'm going to kick your ass." According to Jones, Colella further said: "I have been beating niggers up all my life." Jones testified that none of the Amtrak officers touched or provoked Colella while he was being held.

Colella testified and contended that on the night in question he was approached by a "pan handler" wearing "filthy" clothing. He told him, "I'm not interested, go away." However, according to Colella, Young persisted to bother him and Torres about the credit card. Colella told him to get lost. Young became belligerent and cursed at Colella. Young said: "Who the hell are you, all I wanted to do is ask you about this card, you fucking fat white boy."

According to Colella, Young approached him as if to fight. Fearing that he or Torres would be harmed, he punched Young in the head. Immediately, an officer arrived on the scene and arrested him. Colella claimed he became upset because the police did not accept his version of the facts, and instead appeared to be sympathetic to Young.

Colella acknowledged telling the arresting officer, "I don't believe you are going to take that nigger's word over mine." However, he only said this because he was upset by the fact that Young had called him a "fat white boy." Colella felt he was "doomed" since he had hit Young and called him a "nigger." Collela claimed that at no time did he resist the officers, but acknowledged yelling to Torres to call his father.

Colella was handcuffed to a pole behind his back in a holding room. Colella contended the police seized his wallet and personal belongings including his cigarettes, which the police smoked in his presence. An African–American officer then took his money and divided it among the other officers. When Colella protested, the officer got in his face and said, " 'You got a problem with that?' " Colella indicated he did not have any problem, but could not

believe what was occurring. Colella asserted that when he was released by the Trenton police, he did not receive the money or train pass which had been confiscated.

He acknowledged spitting on Officer Eisman, but claimed it was in retaliation for being hit by the police and confronted by the African–American police officer. He thought that his rights had been violated, and that he had been ridiculed by the officers. He denied making the statement that he beat up black individuals regularly. Character testimony was submitted that Colella was neither a racist nor a fighter. Torres also testified and supported defendant's version to a substantial extent.

With regard to Colella's first point, alleging that the trial judge failed to give the appropriate charge on causation, we clearly find no merit. The standard charge was given. It was appropriate. *R.* 2:11–3(e)(2).

As to the second point, that the verdict was against the weight of the evidence, we also conclude that it is non-meritorious. Clearly there was evidence from which a jury could conclude that Colella caused serious bodily injury to Lymus Young. As the trial judge stated:

> Having listened to all the evidence presented at trial, the Court is convinced that both the motion for judgment under 3:18 and against the weight of the evidence must fail. The fact of the matter is that Mr. Colella did inflict serious bodily injury upon Mr. Young. There's evidence he lost his eye as a result of at least one punch, giving him the benefit of the doubt, while Mr. Colella, who is a large man and large in proportion to the victim, therefore, the injury was within the realm of what could be contemplated, and I find the argument not meritorious.

Young suffered the loss of the remaining function of his left eye. The loss of an eye is "serious bodily injury." *See State v. Sloane,* 111 *N.J.* 293, 299, 544 *A.*2d 826 (1988).

Lastly, Colella contends that the sentencing court erred in ruling that the circumstances of this case met the statutory requirements of *N.J.S.A.* 2C:44–3e, which compels the imposition of an extended term sentence for crimes the judge finds by a preponderance of the evidence are committed with the purpose of

intimidating an individual because of race. In reviewing an extended term sentence, an appellate court must first determine whether the statutory criteria for the possible imposition of an enhanced penalty were met. *State v. Dunbar,* 108 *N.J.* 80, 89, 527 *A.*2d 1346 (1987); *State v. Roth,* 95 *N.J.* 334, 364, 471 *A.*2d 370 (1984). Next, the reviewing court must consider whether the sentencing court's decision to proceed with extended term sentencing constituted an abuse of discretion. *Dunbar, supra,* 108 *N.J.* at 89, 95–96, 527 *A.*2d 1346. Lastly, an appellate panel must determine whether the sentencing court correctly applied the sentencing guidelines contained in *N.J.S.A.* 2C:43-7, and whether the findings of fact regarding aggravating and mitigating factors were based on competent and reasonably credible evidence in the record. *Dunbar, supra,* 108 *N.J.* at 96–97, 527 *A.*2d 1346; *Roth, supra,* 95 *N.J.* at 364–65, 471 *A.*2d 370.

An appellate court must avoid substituting its judgment for the judgment of the lower court. *State v. O'Donnell,* 117 *N.J.* 210, 215, 564 *A.*2d 1202 (1989); *State v. Ghertler,* 114 *N.J.* 383, 388, 555 *A.*2d 553 (1989). It must, instead, confine itself to an assessment of whether or not the lower court's application of the facts to the law constituted such clear error of judgment as to shock the judicial conscience. *Roth, supra,* 95 *N.J.* at 363–65, 471 *A.*2d 370.

In this case Colella was sentenced to an extended term under *N.J.S.A.* 2C:44-3e. *N.J.S.A.* 2C:44-3 provides that the court "*shall,* upon application of the prosecuting attorney, sentence a person who has been convicted of a crime, ... to an extended term if it finds, by a preponderance of the evidence, the grounds in subsection e," namely that "[t]he defendant in committing the crime acted ... with a purpose to intimidate, an individual or group of individuals because of race, color, religion, sexual orientation or ethnicity."

The judge set forth her reasons for granting the State's application under *N.J.S.A.* 2C:44-3 as follows:

The overwhelming weight of the evidence leads the Court to believe that the assault was motivated by the fact that Mr. Young was an African–American. The

Defendant's words both before and after the attack, and the fact that there appears to be little if any other reason for such a violent attack support this conclusion, the conclusion that he intended to intimidate the victim because of race.

This statute was enacted to discourage bias motivated crimes. The comment to the section states that this legislation was designed to treat bias motivated crimes more specifically and harshly. Even if Mr. Young was assumed by the Defendant to be a vagrant of African–American descent, who the Defendant feared because of some stereotypical held notion regarding African–Americans, his intent would still be to intimidate him based on race. The Court is clearly convinced that the evidence demonstrates this crime would not have been committed if Mr. Young were white. Because this Court is convinced that the crime was racially motivated, an extended term will be imposed.

We are in complete accord with the trial judge's conclusion. That conclusion is supported by substantial, credible evidence in the record. *State v. Marcus,* 294 *N.J.Super.* 267, 290, 683 *A.*2d 221 (App.Div.1996) (citing *State v. Johnson,* 42 *N.J.* 146, 199 *A.*2d 809 (1964)).

In imposing sentence on Colella, Judge Rosemarie Williams found the following aggravating factors: (1) the nature and circumstances of the offense (*N.J.S.A.* 2C:44–1a(1)); (2) the gravity and the seriousness of the harm (*N.J.S.A.* 2C:44–1a(2)); (3) the risk that defendant will commit another offense (*N.J.S.A.* 2C:44–1a(3)); (4) the extent of defendant's prior criminal record (*N.J.S.A.* 2C:44–1a(6)), which included episodes of violence; and (5) the need to deter defendant and others from violating the law (*N.J.S.A.* 2C:44–1a(9)). The judge found that defendant was entitled to only one mitigating factor based upon his troubled family background, (*N.J.S.A.* 2C:44–1b(4)). She was clearly convinced that the multiple aggravating circumstances substantially outweighed the single mitigating circumstance.

We are satisfied there is no basis for disturbing the sentence imposed. The trial judge imposed the sentence consonant with the Criminal Code as explicated by case law. *See State v. Ghertler, supra,* 114 *N.J.* at 387–89, 555 *A.*2d 553. Application of the law to the facts discloses no abuse of discretion, and the

sentence does not shock our judicial conscience. *See State v. Roth, supra,* 95 *N.J.* at 363–66, 471 *A.*2d 370.

Affirmed.